UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim. Case No.: 05-267 (RMC) |
| FRANCISCO TORRES-GARCIA | |

**DEFENDANT TORRES-GARCIA'S MOTION TO DISMISS
THE INDICTMENT FOR LACK OF JURISDICTION AND
MEMORANDUM OF SUPPORTING POINTS AND AUTHORITIES**

**COMES NOW DEFENDANT, Francisco Torres-Garcia,** through undersigned counsel, and respectfully submits this motion to dismiss the indictment filed against him for lack of jurisdiction and outrageous governmental conduct. Mr. Torres-Garcia further asks this Court for an order directing the government of the United of America (hereinafter referred to as "U.S.") to immediately repatriate him to his home country, the United Mexican States (hereinafter referred to as "Mexico").

Defense counsel requested a hearing on this motion and the Court set Wednesday, January 3, 2007, at 2:00 p.m. as a motion hearing date.

**Concise Background & Argument**

Mr. Torres-Garcia resides in and is a citizen of Mexico. On August 7, 2005, Mr. Torres-Garcia boarded a plane in Mexico City, Mexico. The flight left Mexico City and landed in Panama City, Republic of Panama (hereinafter referred to as "Panama") at the city's Tocumen International Airport. The plane taxied to the designated gate and stopped. At that time, the passenger bridge that connects the plane to the airport building docked with the plane and passengers began disembarking.

Mr. Torres-Garcia waited in line to leave the plane along with his fellow passengers. As he stepped off of the plane and set foot on the passenger bridge, he was detained by federal agents from the U.S. Drug Enforcement Agency (DEA). Mr. Torres-Garcia was forcibly separated from his traveling companion, removed of his possessions, and whisked out of a door in the passenger bridge that led to a stairway down to the airport tarmac. At the bottom of the stairs, Mr. Torres-Garcia was placed in a waiting car that drove to a detached portion of the airport grounds. A U.S. plane was waiting; he was placed on board the plane and forcibly removed from Panama. Without knowledge of where he was going, Mr. Torres-Garcia was flown to Guantanamo Bay, Cuba, eventually landed in the U.S. (Ft. Lauderdale, Florida) and made his way to the District of Columbia.

The actions of the U.S. government circumvented Mexican and Panamanian sovereignty. Mr. Torres-Garcia, a Mexican citizen, was traveling under authority granted by Mexico, and lawfully landed in Panama. The result of the U.S. government conduct has left this Court without jurisdiction to hear the case. Furthermore, the U.S. government conduct is outrageous and demands dismissal of the pending indictment.

## Memorandum Of Supporting Points And Authorities

In 1992, the United States Supreme Court decided the *most-recent* seminal case in the area of law addressing the power of a court to try a defendant forcibly taken from another country, the case of *United States v. Alvarez-Machain*, 504 U.S. 655 (1992). The Court decided that a criminal defendant abducted by agents of the U.S. from a nation with which it has an extradition treaty, does not acquire a defense to the jurisdiction of U.S. courts, unless the governing extradition treaty specifically prohibits such abductions. 504 U.S. 655 (1992)(Mexican national abducted from Mexico did not acquire a defense to jurisdiction because

extradition treaty between the U.S. and Mexico did not specifically prohibit abductions to secure a defendant's presence).

In reaching its decision in *Alvarez-Machain*, the Supreme Court examined a line of cases dealing with abducted defendants and their extraterritorial circumstances dating back to 1886.  In *Ker v. Illinois,* 119 U.S. 436 (1886), the Court ruled that a defendant kidnapped by a private agent could be put to trial, despite the absence of an extradition treaty between the involved nations.  In *United States v. Rauscher*, 119 U.S. 407 (1886), the Court held that a person brought into a jurisdiction by virtue of proceedings under an extradition treaty can only be tried for offenses described in the treaty and only for the offense charged in the extradition proceedings until given opportunity to return to the country extradited from; giving rise to the "doctrine of speciality."  In *Frisbie v. Collins*; 342 U.S. 519 (1952), the Court upheld the conviction of a defendant who was kidnapped in Chicago by Michigan authorities and noted that due process was satisfied by a fair trial in accordance with constitutional procedural safeguards. More importantly the *Alvarez-Machain* decision and analysis also cited the case of *Air France v. Saks* for the proposition that when construing a treaty, just like a statute, a court must first look to its terms to determine its meaning. 504 U.S. 655, 663 citing 470 U.S. 392, 397 (1985).

Consistent with the Supreme Court decision in *Alvarez-Machain*, and as concisely stated by Chief Justice Rehnquist in the decision, the first step in analyzing Mr. Torres-Garcia's case, and similar cases, is clear:

> Therefore, our first inquiry must be whether the abduction of respondent from Mexico violated the Extradition Treaty between the United States and Mexico. If we conclude that the Treaty does not prohibit respondent's abduction, the rule in *Ker* applies, and the court need not inquire as to how respondent came before it.

504 U.S. at p.662.  In Mr. Torres-Garcia's case, contrary to the extradition treaty referenced in *Alvarez-Machain*, the extradition treaty between Panama and the U.S. explains, with

3

particularity, the "proper course" for securing the arrest and detention of a fugitive who is located in Panama prior to presenting the formal proofs necessary for extradition. *Treaty Between the United States and Panama for the Mutual Extradition of Criminals*, May 25, 1904, 34 Stat. 2851, TS 445, 10 Bevans 673 (hereinafter referred to as "U.S.-Panama Extradition Treaty").[1]

The U.S.-Panama Extradition Treaty sets the transfer terms of any person charged with a crime in its very first article. The treaty language moves Mr. Torres-Garcia's case away from the limitation of *Alvarez-Machain*. Article I of the treaty states in pertinent part:

> The Government of the United States and the Government of the Republic of Panama **mutually agree to deliver up persons** who, having been charged with or convicted of any of the crimes and offenses specified in the following article, committed within the jurisdiction of one of the contracting parties, shall seek an asylum or be found within the territories of the other: **Provided that this shall only be done upon such evidence of Criminality as, according to the laws of the place where the fugitive or person so charged shall be found,** would justify his or her apprehension and commitment for trial if the crime or offense had been there committed.

*Id.* (Emphasis added.). Per the specific language of the treaty, the "delivery of a person" "shall only be done" under the guidance of the treaty. *Cf. Alvarez-Machain, supra* (Court held no specific prohibition against forcible removal could be found in the treaty language.). Continuing, Article IV of the U.S.-Panama Extradition Treaty then specifically states the "proper" procedure for the transfer of a person:

> Where arrest and detention of a fugitive are desired on telegraphic or other information in advance of the presentation of formal proofs . . . [and] [w]hen . . . the arrest and detention of a fugitive are desired in the Republic of Panama, *the proper course shall be to apply to the Foreign Office, which will immediately cause the necessary steps to be taken in order to secure the provisional arrest or detention of the fugitive.* The provisional detention of the fugitive shall cease and

---

[1] The treaty was signed at the City of Panama on May 25, 1904; ratification advised by the Senate, January 6, 1905; ratified by President Theodore Roosevelt, January 20, 1905; ratified by Panama, May 25, 1904; ratifications exchanged at City of Panama, April 8, 1905; and finally, proclaimed on May 12, 1905.

4

> the prisoner be released if a formal requisition for his surrender, accompanied by the necessary evidence of his criminality has not been produced under the stipulations of this Treaty, within two months from the date of his provisional arrest or detention."

*Supra,* (Emphasis added.). Clearly, the *proper*, as opposed to improper or impermissible means or method of arresting or detaining a fugitive in Panama prior to formally extraditing the fugitive, is an application to the "Foreign Office", not an abduction by agents of the U.S. government.[2] *Id.* Moreover, in contrast to the authority of *Alvarez-Machain,* the treaty precludes abduction in lieu of a proper and orderly method of extradition as specifically set forth in Article IV of the treaty.

Mr. Torres-Garcia was lured into Panama by federal agents of the U.S. and abducted immediately upon arrival. Interestingly enough, the extradition treaty between the U.S. and Mexico (the country of Mr. Torres-Garcia's citizenship and residence), although interpreted otherwise in *Alvarez-Machain,* effectively prohibits extradition unless the contracting parties participate in a complex series of evidence and document presentation, none of which was done. *Extradition Treaty, May 4, 1978, [1979] United States-United Mexican States,* 31 U.S.T. 5059.

Not only did the U.S. government try to circumvent its agreement with Mexico, but it blatantly violated the explicit terms of its treaty with Panama. It seems incredulous that a government can maintain a "straight-face" and proclaim that since no treaty language specifically says "don't kidnap our citizens," then kidnapping is acceptable. Article after article, in treaty after treaty clearly states the steps to be taken when one nation seeks another nation's assistance in apprehending a wanted person. This outrageous government conduct truly "shocks

---

[2] In the recently decided case of *United States v. Mejia,* 448 F.3d 436 (D.C. Cir. 2006), a similar argument regarding forcible abduction from Panama was made by defendants and rejected. However, the case is clearly distinguishable as the Court of Appeals noted that appellants in *Mejia* failed to ". . . cite any provision of the United States' extradition treaty with Panama that would warrant a different result here." Mr. Torres-Garcia has provided the Court with specific articles in the U.S.-Panama Extradition Treaty prohibiting any conduct outside the specific steps contracting parties must make.

the conscience" and warrants a complete dismissal of indictment against Mr. Torres-Garcia and his immediate repatriation to Mexico.

**WHEREFORE,** Mr. Torres-Garcia asks this Court to dismiss the pending indictment and order his immediate repatriation to Mexico.

        Respectfully submitted,

        **RETURETA & WASSEM, P.L.L.C.**

By: _____/s/_____
     Manuel J. Retureta, Esq.
     District of Columbia Bar #430006
     601 Pennsylvania Avenue, NW
     South Building – Suite 900
     Washington, D.C. 20004
     (202) 220-3073
     (202) 220-3130 Fax

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true copy of the foregoing pleading was served on all parties via ECF on this 17th day of November 2006.

_____/s/_____
Manuel J. Retureta, Esq.