## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Criminal Action No. 05-267 (RMC)** |
| | ) | |
| **FRANCISCO TORRES-GARCIA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### MEMORANDUM OPINION

Francisco Torres-Garcia is charged alone, in a two-count indictment, with narcotics trafficking and money-laundering. The charges stem from an alleged conspiracy, with unindicted coconspirators, to import cocaine and methamphetamine into the United States from Latin America. Mr. Torres-Garcia filed two motions to dismiss the indictment: (1) for lack of jurisdiction because, he asserts, the Government illegally abducted him from Panama; and (2) for improper venue because, he argues, there is no factual nexus to the District of Columbia. As explained below, the Court will deny the motions to dismiss.

### I.  BACKGROUND FACTS

On July 21, 2005, the government filed a two-count indictment against Mr. Torres-Garcia, a citizen and resident of Mexico, in the United States District Court for the District of Columbia. The Grand Jury in Washington, D.C. indicted Torres-Garcia for: (1) conspiring and attempting to distribute five kilograms or more of cocaine and 500 grams or more of methamphetamine, intending and knowing that the drugs will be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 963, 960(a)(1), 960(a)(3), 960(b)(1)(B)(ii), 960(b)(1)(H) and 18

U.S.C. §2; and (2) conspiring to launder monetary instruments, in violation of 18 U.S.C. §§ 1956(h), 1956(a)(2) and 1956(a)(3) and 18 U.S.C. § 2. A magistrate judge issued an arrest warrant for Mr. Torres-Garcia on the same day as the indictment.

On August 3, 2005, this arrest warrant was entered into INTERPOL's international database, alerting police agencies world-wide that the defendant was wanted in the United States. Panama is a member country of INTERPOL and its police authorities have access to this database. Thereafter, an undercover agent of the Drug Enforcement Administration ("DEA"), who had twice met with Mr. Torres-Garcia in Panama, scheduled a third meeting with him in Panama for August 8, 2005. On August 7, Mr. Torres-Garcia flew to Panama for this meeting. Mr. Torres-Garcia proffers that after stepping off the plane and onto the passenger bridge, he was detained by DEA agents, who escorted him out a side door in the passenger bridge, down a flight of stairs, and onto the tarmac to an awaiting car. He was then taken to a U.S. plane, on which he was flown to Fort Lauderdale, Florida., via Guantanamo Bay, Cuba. The Government elaborates that it secured custody of Mr. Torres-Garcia by working with the Panamanian authorities, proffering that, upon his arrival in Panama, Mr. Torres-Garcia was met at the plane by Panamanian officers, who confirmed his identity, denied him admission to Panama, and escorted him from the gate to the tarmac, where DEA officials waited.

Also in August 2005, the Government filed a criminal complaint against Mr. Torres-Garcia and four alleged coconspirators in the Northern District of Illinois, charging them with money laundering and narcotics conspiracy. A few weeks later, on September 6, 2005, that complaint was replaced with a one-count indictment charging the same defendants with a narcotics conspiracy. Neither indictment provides factual details. However, Mr. Torres-Garcia and the Government

appear to agree that the affidavit attached to the Illinois indictment provides the relevant background facts. In essence, the Government alleges that Mr. Torres-Garcia, operating from Mexico, directed the activities of coconspirators located in Illinois and Texas. The parties agree that Mr. Torres-Garcia did not set foot in the United States.

Mr. Torres-Garcia contends that (a) the U.S. government's conduct leaves this Court without jurisdiction to hear this case, and also contends that (b) a person operating outside the United States in a conspiracy to manufacture or distribute controlled substances outside the territory of any state has a Constitutional and statutory right to be tried only in a district where co-conspirators committed overt acts.

## II. ANALYSIS

### A. Jurisdiction

Mr. Torres-Garcia's jurisdictional argument is twofold. First, he argues that the Government violated the United States's extradition treaty with Panama by essentially kidnapping him in Panama after his flight landed but before he passed through customs. The Government does not assert that it complied with the extradition treaty; in fact, it denies that it is required to use the extradition process. Second, Mr. Torres-Garcia argues that the Government's "outrageous" conduct is an independent basis for dismissal of the Indictment.

### 1. U.S.–Panama Extradition Treaty

This issue is controlled by the Supreme Court's decision in *United States v. Alvarez-Machain*, 504 U.S. 655 (1992), and the D.C. Circuit's recent decision in *United States v. Mejia*, 448 F.3d 436 (D.C. Cir. 2006), *cert. denied*, 127 S.Ct. 989 (2007). In *Alvarez-Machain*, the Supreme Court sanctioned the use of forcible kidnapping of a criminal defendant, outside the provisions of

an extradition treaty, so long as the extradition treaty does not provide the exclusive method for

obtaining custody of the defendant. In doing so, it reaffirmed the rule first announced in *Ker v.*

*Illinois*, 119 U.S. 436, 444 (1886), that:

> [T]he power of a court to try a person is not impaired by the fact that
> he had been brought within the court's jurisdiction by reason of a
> forcible abduction. . . . [D]ue process of law is satisfied when one
> present in court is convicted of crime after having been fairly
> apprized [sic] of the charges against him and after a fair trial in
> accordance with constitutional procedural safeguards. There is
> nothing in the Constitution that requires a court to permit a guilty
> person rightfully convicted to escape justice because he was brought
> to trial against his will.

*Alvarez-Machain*, 504 U.S. at 662 (quoting *Frisbie v. Collins*, 342 U.S. 519, 522 (1952)) (internal

quotation marks omitted). The *Alvarez-Machain* Court set forth the following framework to evaluate

jurisdictional challenges that hinge on the interpretation of an extradition treaty:

> [O]ur first inquiry must be whether the abduction of respondent from
> Mexico violated the Extradition Treaty between the United States and
> Mexico. If we conclude that the Treaty does not prohibit
> respondent's abduction, the rule in *Ker* applies, and the court need not
> inquire as to how respondent came before it.

*Id.* The Court then reviewed the text of the U.S.–Mexico treaty and the historical context in which

it was adopted. It first observed that the treaty "said nothing about the obligations of the United

States and Mexico to refrain from forcible abductions . . . or the consequences under the Treaty if

such an abduction occurs." *Id.* This, the Court reasoned, amounted to a reservation of the right to

use such measures when operating outside the confines of the treaty: the treaty "does not purport to

specify the only way in which one country may gain custody of a national of the other country for

the purposes of prosecution," but merely "provides a mechanism which would not otherwise

exist,…establishing the procedures to be followed when [it] is invoked." *Id.* The Court thus rejected

-4-

the argument that the U.S.–Mexico treaty was a comprehensive document designed to cover the entire subject of extradition. *Id.* at 668-9. The Court next noted that, although the Mexican government was aware of the *Ker* doctrine as early as 1906, the treaty, signed in 1978, made no attempt to avoid its effect. *Id.* at 665. Finally, it found the norms of international law were insufficiently clear to compel a different result. Thus, the rule of *Ker* controlled. *Id.* at 670.

In *United States v. Mejia*, the D.C. Circuit applied this analytical framework to the precise extradition treaty at issue here. *Mejia*, 448 F.3d at 443 (evaluating the Treaty Providing for the Extradition of Criminals, U.S.–Panama, May 25, 1904, 34 Stat. 2851). The D.C. Circuit noted that, "[l]ike the U.S.–Mexico treaty, the U.S.–Panama treaty contains no prohibition against procuring the presence of an individual outside the terms of the treaty — let alone one barring the signatories from informally cooperating with each other as they did in this case." *Id.* Because the defendant offered no ground on which the U.S.–Panama could be distinguished from the U.S.–Mexico treaty, the D.C. Circuit affirmed the district court's exercise of jurisdiction. *Id.*

In an effort to avoid *Mejia*, Mr. Torres-Garcia argues that the U.S.–Panama treaty is distinguishable on two grounds. First, he reads the "specific language" of Article I to require that "the 'delivery of a person' 'shall only be done' under the guidance of the treaty." Def.'s Mot. at 4 (quoting U.S.–Panama treaty, Art. I). This reading of Article I is too strained to be credited. Article I of the U.S.–Panama treaty provides, in full:

> The Government of the United States and the Government of the Republic of Panama mutually agree to *deliver up persons* who, having been charged with or convicted of any of the crimes and offenses specified in the following article, committed within the jurisdiction of one of the contracting parties, shall seek an asylum or be found within the territories of the other: Provided that this *shall only be done* upon such evidence of Criminality as, according to the

-5-

> laws of the place where the fugitive or person so charged shall be
> found, would justify his or her apprehension and commitment for trial
> if the crime or offense had been there committed.

U.S.–Panama treaty, Art. I (emphasis added).   The better reading, in light of *Alvarez-Machain*, is

that when one government chooses to proceed via extradition, and invokes the treaty's provisions,

the person sought shall not be delivered absent an adequate showing of evidence (e.g., probable

cause).   *See Alvarez-Machain*, 504 U.S. at 662 (stating that the U.S.–Mexico treaty is not an

exclusive mechanism; it merely "establish[es] the procedures to be followed when [it] is invoked").

This reading is bolstered by the similarity between Article I of the U.S.–Panama treaty and Article

III of the U.S.–Mexico treaty, the latter of which is titled "Evidence Required" and reads:

> Extradition *shall be granted only* if the evidence be found sufficient,
> according to the laws of the requested Party, either to justify the
> committal for trial of the person sought if the offense of which he has
> been accused had been committed in that place or to prove that he is
> the person convicted by the courts of the requesting Party.

Extradition Treaty, U.S.–Mexico, May 4, 1978, 31 U.S.T. 5059, Art. III (emphasis added).

Mr. Torres-Garcia next argues that Article IV of the U.S.–Panama treaty states that

the "proper" extradition procedure involves an application to the "Foreign Office"; thus, "abduction"

must be precluded as a lawful alternative.   Def.'s Mot. at 4-5.   Article IV provides, in part:

> Where arrest and detention of a fugitive are desired on telegraphic or
> other information in advance of the presentation of formal proofs, the
> *proper* course in the . . . Republic of Panama . . . shall be to apply to
> the Foreign Office, which will immediately cause the necessary steps
> to be taken in order to secure the provisional arrest or detention of the
> fugitive.

U.S.–Panama treaty, Art. IV (emphasis added).   The word "proper" cannot support the weight Mr.

Torres-Garcia places on it.   Read in context, it is clear that this Article is concerned with procedures

to be followed when the United States wishes to secure a "provisional arrest" "in advance of the presentation of formal proofs." Thus, like Article I, Article IV addresses the procedures to be used *if and when* the extradition process is invoked; it does not limit the United States to the extradition procedures outlined in the treaty.

### 2. Extraordinary Conduct

Finally, Mr. Torres-Garcia argues that the Government's tactics in luring Mr. Torres-Garcia to Panama and then abducting him were so extraordinarily heavy-handed that it is appropriate to dismiss for lack or jurisdiction and order Mr. Torres-Garcia repatriated to Mexico. Even if *Alvarez-Machain* could be read to leave open this option under exceptional circumstances, *see* 504 U.S. at 669 (noting that it "may be correct that [defendant's] abduction was 'shocking,' and that it may be in violation of general international law principles," but concluding that these concerns were best dealt with in diplomatic channels), those circumstances are not met here; indeed, Mr. Torres-Garcia cites no case in which such circumstances *have* been met. In *Alvarez-Machain*, the Court noted a number of cases, involving both domestic and international forcible abduction, in which the trial court's exercise of jurisdiction was ultimately deemed appropriate, even in the face of objections from a foreign government. Here, the Government asserts that the DEA actually worked with the Panamanian government to secure custody of Mr. Torres-Garcia, making its conduct less shocking than in *Alvarez-Machain* itself and similar to the intergovernmental cooperation held permissible in *Mejia*. *See Mejia*, 448 F.3d at 443 ("[T]he U.S.–Panama treaty contains no prohibition against… barring the signatories from informally cooperating with each other … .").

The motion to dismiss for lack of jurisdiction will be denied. Mr. Torres-Garcia has failed to distinguish the U.S.–Panama treaty from the U.S.–Mexico treaty addressed in *Alvarez-*

*Machain*; thus, the rule in *Ker* holds. He also has failed to demonstrate extraordinary circumstances warranting dismissal.

### B. Venue

The Government's choice of venue is constrained by three provisions—two constitutional and one a procedural rule. Article III, Section 2 of the Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed; but when not committed within any State the Trial shall be at such Place or Places as the Congress may by Law have directed." Likewise, the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district where the crime shall have been committed." Federal Rule of Criminal Procedure 18 implements these mandates, providing that, "[e]xcept as otherwise permitted by statute or these rules, the prosecution shall be had in the district in which the offense was committed." The Government bears the burden of establishing by a preponderance of the evidence that venue is appropriate. *United States v. Lam Kwong-Wah*, 924 F.2d 298, 301 (D.C. Cir. 1991).

Here, the Government argues that Mr. Torres-Garcia's offenses were committed extraterritorially and that venue is properly laid in the District of Columbia under either of two statutes: 21 U.S.C. § 959(c) and 18 U.S.C. § 3238.

### 1. 21 U.S.C. § 959(c)

The Government devotes the majority of its argument to sustaining venue under 21 U.S.C. § 959(c):

> Acts committed outside territorial jurisdiction of United States; venue. This section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the

> United States.  Any person who violates this section shall be tried in
> the United States district court at the point of entry where such person
> enters the United States, or in the United States District Court for the
> District of Columbia.

The problem for the Government is that, strictly construed, this special venue provision applies only

to § 959; however, Mr. Torres-Garcia is not charged with a *substantive* violation of § 959, but with

a *conspiracy* to violate § 959.  The latter offense is proscribed by a separate section, 21 U.S.C. § 963,

which states:

> Any person who attempts or conspires to commit any offense defined
> in this title shall be subject to the same penalties as those prescribed
> for the offense, the commission of which was the object of the
> attempt or conspiracy.

Section 963 does not, itself, contain a special venue provision.

The Government argues that § 959 — which prohibits the distribution of Schedule

II controlled substances when it is known or intended that the substances will be unlawfully imported

into the United States — can only be violated extraterritorially; thus its special venue provision.

From that premise, it argues that "it is impossible to violate § 959 (or [to] conspire to violate § 959)

without the very essence of the crime occurring outside the United States.  Thus, by its express

terms, a violation of § 959 (and by extension a conspiracy to violate § 959 under § 963) does not

occur within the territory of a state for venue purposes."  Gov't Mem. at 7-8.  Accordingly, it argues

that § 959's special venue provision must be read to apply to charges under § 963.

This argument was recently rejected by Judge Lamberth in an opinion that carefully

points out its many faults.  *United States v. Cobar*, No. 05-451, 2006 WL 3289267 (D.D.C. Nov. 9,

2006).  Judge Lamberth reasoned that the argument muddies the distinction between conspiracy

charges and substantive offenses, which have long been understood to be "distinct evil[s]."  *Id.* at

*2. In general, he noted, the crime of conspiracy is complete upon formation of the agreement itself; at common law, and modernly in the context of drug conspiracies, no overt act is required. *Id.* (citing cases). Moreover, courts typically conduct a separate venue analysis for conspiracy charges and substantive offenses. *Id.* at *3 (citing cases). Finally, he found no indication in the statutory text that § 963 should be read together with § 959 for venue purposes. *Id.*

There is an additional flaw to the Government's argument. The Government assumes that a defendant can neither violate *nor conspire to violate* § 959 without the crime occurring outside the United States. However, because the crime of conspiracy is complete upon formation of the agreement, it is feasible that conspirators could agree, while within the United States, to distribute narcotics outside the United States knowing or intending that the drugs would ultimately be imported. Although the hypothetical strays afield from the instant facts, it undercuts the Government's argument that § 963 should in all cases incorporate § 959(c)'s special venue provision.

Ultimately, the Court does not have to decide this issue because the Government's case for venue is far better under 18 U.S.C. § 3238.

## 2. 18 U.S.C. § 3238

Even if § 959(c) is inapplicable, venue is proper under 18 U.S.C. § 3238. That section titled, "Offenses not committed in any district," reads:

> The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought; but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender or of any one of two or more joint

-10-

offenders, or if no such residence is known the indictment or
information may be filed in the District of Columbia.

Mr. Torres-Garcia argues that this venue provision is inapplicable here because, although "any . . .
conspiracy . . . would have been entered into . . . while he was outside the United States," Def.'s
Mot. at 8, a number of overt acts in furtherance of the conspiracy took place within U.S. territory,
specifically, in Illinois and Texas. He asserts that § 3238's text "clearly states" that it "is only
applicable in cases where criminal activity did not occur within the geographical limits of any State
or [d]istrict." *Id.* at 12; *see also id*. at 17 ("[Section] 3238 merely pertains to crimes committed
wholly outside the geographical limits of any State.").

          Mr. Torres-Garcia's plain language argument is unpersuasive. Although it is
supported by § 3238's title, "Offenses not committed in any district," it is undermined by the text
itself, which makes the section applicable to offenses "*begun* or committed upon the high seas, or
elsewhere out of the jurisdiction of any particular State or district." 18 U.S.C. § 3238 (emphasis
added); *Penn. Dep't of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998) ("[T]he title of a statute
…cannot limit the plain meaning of the text."). Mr. Torres-Garcia's construction would read the
word "begun" out of the statute. In addition, if the offense of conspiracy is completed once the
agreement is formed, and, as Mr. Torres-Garcia arguably has conceded, he joined any conspiracy
outside the United States, Def.'s Mot. at 8, then the alleged offense was "committed" outside the
United States, later overt acts notwithstanding. *See Whitfield v. United States*, 543 U.S. 209, 218
(2005) (noting, in the context of a money laundering conspiracy, that under Fed. R. Crim. P. 18's
default rule, "the offense was committed" in "the district in which the unlawful agreement was
reached"); *see also id.* (noting that venue is also proper "in any district in which an overt act in

-11-

furtherance of the conspiracy was committed").

Mr. Torres-Garcia also relies on *United States v. Gilboe*, 684 F.2d 235, 239 (2d Cir. 1982), to support his argument. In *Gilboe*, the defendant was prosecuted for global wire fraud that led to funds moving through the Southern District of New York. The Second Circuit held that 18 U.S.C. § 3237, which applies to offenses begun in one district and completed in another, was the appropriate venue provision, noting in passing that § 3238 "applies only to offenses 'not committed in any district,' as its title indicates." *Id*. at 239.

In a later decision by the Fourth Circuit, the Second Circuit's statement was dismissed as dictum.[1] *See United States v. Levy Auto Parts*, 787 F.2d 946, 950-51 (1986). In *Levy*, the defendants took their cue, as Mr. Torres-Garcia does here, from the section's title and argued that venue may not be founded upon § 3238 if the offenses involved any activity in the United States. *See id*. at 950. The Fourth Circuit surveyed the scant case law addressing § 3238's evolution and application, and found more persuasive the Fifth Circuit's analysis of § 3238. *See United States v. Williams*, 589 F.2d 210, 213 (5th Cir. 1979), *adopted in pertinent part*, 617 F.2d 1063, 1071 (5th Cir. 1980) (holding that venue was proper in the Southern District of Alabama, where Williams's offense, conspiracy to import marijuana in violation of 21 U.S.C. § 963, was committed outside the United States, notwithstanding the fact that the overt act in furtherance of the conspiracy was

---

[1] In fact a more recent decision in the United States District Court for the Southern District of New York has specifically addressed *United States v. Gilboe*. *See United States v. Bin Laden*, 146 F.Supp. 2d 373, 381 n. 17 (S.D.N.Y. 2001) (noting that the statement in *Gilboe* suggesting that § 3238 is limited to offenses committed wholly abroad because of the title of the section is "unconsidered dictum.") The court says that "a myopic reading of section 3238 is directly in conflict with the clear language of the statute," and "has never been favorably cited or relied upon, and has subsequently been rejected by the overwhelming weight of authority." *Bin Laden*, 146 F.Supp. 2d at 381 n. 17.

committed in New York); *see also United States v. Erwin*, 602 F.2d 1183, 1185 (5th Cir. 1979).

The Fourth Circuit is in accord with decisions of the Fifth Circuit that conclude that "there is an

overlap between the two sections, and . . . venue under § 3238 is appropriate notwithstanding the fact

that venue in another district also could have been appropriate under § 3237." *Levy Auto Parts*, 787

F.2d at 951; *Williams*, 589 F.2d at 213 (explaining that it would be an "erroneous premise" to

suggest that "if venue is proper under 18 U.S.C. § 3237(a), venue cannot be proper under § 3238).

The Fourth Circuit's holding in *Levy* upheld venue under § 3238 where the alleged conspiracy was

"essentially foreign" and any domestic overt acts were "slight and tangential" to the charged

conspiracy. *See Levy Auto Parts*, 787 F.2d at 952. Here, the conspiracy was foreign and the overt acts

in Texas and Illinois appear more substantial, but precedent makes it clear that venue is proper.

       Venue otherwise appears appropriate in this district under § 3238.  As the

Government notes, that section's two clauses are read in the disjunctive; thus, as Wright & Miller

explain, when the "defendant is indicted *before* he is brought into the United States, he may be tried

in the district in which he was indicted regardless of whether it is the district in which he is first

brought into the United States."  2 Wright & Miller, Federal Practice & Procedure (Criminal) 3d

§ 304 (2006) (emphasis added); *see also United States v. Gurr*, 2006 WL 3526690 (D.C. Cir. Dec.

8, 2006) (holding that although defendant was "arrested in Hawaii after voluntarily entering the

United States, because he was not arrested or 'first brought' into the United States until after he had

been indicted in the District of Columbia, venue was proper in the District of Columbia").  Although

Mr. Torres-Garcia briefly notes that he first was first brought to Fort Lauderdale, Florida, Def.'s Mot.

at 8 n.6, that fact is of no moment under the prevailing interpretation of the statute.  The motion to

dismiss for lack of venue must be denied because venue in the District of Columbia is proper under

-13-

18 U.S.C. § 3238.

### III.  CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss the Indictment for Lack of Venue [Dkt. #18] will be **DENIED**.  Additionally, Defendant's Motion to Dismiss the Indictment for Lack of Jurisdiction [Dkt. #22] will also be **DENIED**.  A memorializing order accompanies this Memorandum Opinion.

DATE: April 24, 2007

_____/s/_____

ROSEMARY M. COLLYER
United States District Judge
